# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| JAMES WESTLEY, | CASE NO. 4:21-CV-01672 |
| Plaintiff, | JUDGE BENITA Y. PEARSON |
| vs. | |
| BRANDESHAWN HARRIS, *et al.*, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendants. | **ORDER (Resolving ECF Doc. 48)** |

Pending before the Court is Plaintiff James Westley's ("Plaintiff" or "Mr. Westley")

Emergency Motion for Sanctions for Spoliation of Evidence and Notice of Defendants'

Continued Bad Faith Litigation Tactics and Abuse of the Judicial System.  (ECF Doc. 48

("Motion for Sanctions").)  Defendants Haines, Gregory, Grimm, Kline, Miller, Garvey, Prasky

and Eubank filed a Memorandum in Opposition (ECF Doc. 49) and Plaintiff filed a Reply (ECF

Doc. 50).  The motion has been referred to the undersigned pursuant to 28 U.S.C. § 636 and

Local Rules 72.1 and 72.2(a).[1]  (ECF Doc. 63.)  For the reasons set forth below, Plaintiff's

Motion for Sanctions (ECF Doc. 48) is **DENIED**.

---

[1] 28 U.S.C. § 636 authorizes a judge to "designate a magistrate judge to hear and determine any pretrial matter pending before the court" except for specifically enumerated motions.  *See* 28 U.S.C. § 636(b)(1)(A).  Additionally, under Fed. R. Civ. P. 72, "[w]hen a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge," the magistrate judge is authorized to resolve the matter by order.  *See* Fed. R. Civ. P. 72(a).  Since a motion for sanctions is not one of the motions excepted from the list of pretrial matters that may be heard and determined by a magistrate judge under 28 U.S.C. § 636(b)(1)(A) and the ruling entered herein is not dispositive, the undersigned enters an Order under 28 U.S.C. 636(b)(1)(A) not a Report and Recommendation under 28 U.S.C. 636(b)(1)(B).

## I.    Procedural History

Plaintiff filed his pro se Complaint on August 27, 2021, while he was incarcerated at the Trumbull Correctional Institution ("TCI"), alleging violations of his constitutional rights and seeking damages under 42 U.S.C. § 1983 against numerous defendants, including former TCI wardens, corrections officers, medical staff, and institutional inspectors.  (ECF Doc. 1.) Following initial screening of Mr. Westley's Complaint under 28 U.S.C. § 1915(e)(2)(B), the Court allowed Mr. Westley's claims to proceed against fifteen of the initial fifty named defendants.  (ECF Doc. 32, pp. 1-2.)  Subsequently, the remaining defendants filed a Motion for Judgment on the Pleadings (ECF Doc. 24), which the Court granted in its entirety on January 27, 2023 (ECF Doc. 32).  Plaintiff filed a pro se notice of appeal with the Sixth Circuit.  (ECF Doc. 34.)  On September 4, 2024, the Sixth Circuit vacated in part and affirmed in part the Court's judgment granting the Defendants' Motion for Judgment on the Pleadings and remanded the matter for further proceedings.  *See Westley v. Harris*, No. 23-3177, 2024 WL 4111143 (6th Cir. Sept. 4, 2024).  The Sixth Circuit issued its mandate on March 6, 2025.  (ECF Doc. 38.)

The Sixth Circuit vacated the Court's judgment as to the following four claims: (1) Claim 3, which alleges that Defendants Haines, Gregory, Grimm, Forsic, and Miller failed to protect Plaintiff from assault by another inmate and subjected him to unsafe living conditions in January 2020, when they assigned Plaintiff to a cell with a "level 4B, STG, C-1 mental health patient" who had a documented history of assaulting cell mates and others; (2) Claim 5, which alleges that Defendant Garvey engaged in excessive force in March 2020 when she coughed on Plaintiff in an attempt to infect him with COVID-19; (3) Claim 6, which alleges that Defendant Prasky[2] engaged in excessive force in May 2020 when he coughed on Plaintiff in an attempt to infect him

---

[2] Originally named as Defendant Sprasky, this defendant was later identified as Jordan Prasky.  (ECF Doc. 14, p. 5.)

with COVID-19; and (4) Claim 7, which alleges that Defendant Eubank engaged in excessive force in December 2020 when he used a chemical agent against Plaintiff maliciously, sadistically, and with no just cause. *See Westley*, 2024 WL 4111143, *3-7; (*see* ECF Doc. 1).

Following the Sixth Circuit's remand order, the Court set dates for the parties to provide and respond to formal written discovery requests and conducted telephonic status conferences on August 6, 2025, and August 14, 2025. Mr. Westley also filed multiple motions, including the present Motion for Sanctions. In his Motion for Sanctions, Mr. Westley requests that the Court impose sanctions on Defendants under the Court's inherent authority and Fed. R. Civ. P. 37(e) for the alleged spoliation of "critical surveillance evidence." (ECF Doc. 48; ECF Doc. 50.) Defendants respond that sanctions are not warranted, arguing that they have complied with the discovery rules as set forth in the Federal Rules of Civil Procedure and that Plaintiff is unable to establish his spoliation claim. (ECF Doc. 49.)

## II.    Relevant Discovery Requests and Responses

Plaintiff submitted pro se discovery requests to Defendants on December 22, 2022. (ECF Doc. 49-1.) Defendants served their responses on January 9, 2023. (ECF Doc. 48-5, p. 68.) Following the Sixth Circuit's remand order, Plaintiff served additional discovery requests on Defendants with the assistance of appointed counsel. (ECF Doc. 48-8.) Defendants served their responses on June 5, 2025. (ECF Doc. 48-8, p. 11.) The relevant requests for production of video footage and recordings, and Defendants' responses thereto, are summarized below.

### A.    Plaintiff's 2022 Pro Se Discovery Requests

#### 1.    Claim 3

##### i.    Plaintiff's Discovery Request

Retrieve camera footage from incident that occurred on January 17, 2020, whole day, where Plaintiff was taken out of isolation cell and forced to

3

move in the cell with inmate Hart (#763-984).  In addition, retrieve camera footage from January 18, 2020 at or around 10:00 PM – 11:00 PM while Plaintiff was in segregation in the cell with inmate Hart . . . Also retrieve the camera footage from outside segregation as Plaintiff was transported to Medical, as well as the camera from inside Medical in the Infirmary hallway, Cell 134. (ECF Doc. 49-1, p. 3.)

### ii.    Defendants' Response

Security video footage from "January 18, 2020, at or around 10:00 PM – 11:00 PM" is provided as Defendants Response to Discovery Bates Stamped 000001 . . . The remainder of the request for [camera footage] is denied.  The requested video footage was either not retained or created. (ECF Doc. 48-5, p. 5.)

## 2.    Claim 5

### i.    Plaintiff's Discovery Request

Retrieve camera footage from incident that occurred on March 18, 2020 in Commissary at the Cashier's window at or around 10:00 AM – 11:00 AM, camera footage of the Plaintiff leaving Commissary to go and report the incident to Lieutenant Carter in the institutions eating area as well as the camera footage on the yard where Plaintiff also reported the incident to Ms. Kitchens.  (ECF Doc. 49-1, p. 3.)

### ii.    Defendants' Response

Neither requested video footage was either not retained or created.  (ECF Doc. 48-5, p. 6.)

## 3.    Claim 6

### i.    Plaintiff's Discovery Request

Retrieve camera footage from incident that occurred on May 29, 2020 in Block 14 West at the Correction Officer's desk at or around 6:00 PM – 7:00 PM.  Also retrieve that camera footage in Block 14 West in front of cell 174.  The Plaintiff then asks that you retrieve Plaintiff's GTL recorded phone conversation on May 29, 2020 around 9:30 AM.  (ECF Doc. 49-1, p. 3.)

ii.     **Defendants' Response**

The requested video recordings were either not retained or created.  GTL phone recordings are not ODRC records and must be obtained from GTL. (ECF Doc. 48-5, p. 6.)

4.     **Claim 7**

i.     **Plaintiff's Discovery Request**

Retrieve camera footage from incident that occurred on December 26, 2020 in Block 14 West Dayroom by the TV and showers.  Also retrieve camera footage afterwards of Zackary Eubank working in Segregation antagonizing the Plaintiff about the assault with the chemical agent as he was doing his rounds standing in front of Plaintiff's cell door taunting him.  (ECF Doc. 49-1, p. 4.)

ii.     **Defendants' Response**

Security video footage from "December 26, 2020, in Block 14 West Dayroom by the TV and showers" is provided as Defendants Response to Discovery Bates Stamped 000002.  The remainder of the request is denied. The requested video recordings were either not retained or created.  (ECF Doc. 48-5, p. 7.)

B.     **Plaintiff's 2025 Discovery Requests, Propounded by Appointed Counsel**

1.     **Plaintiff's Discovery Request**

All video surveillance tapes from all active camera angles of the unit that housed Mr. Westley, the health care facilities to which Mr. Westley was escorted, and segregation cells Mr. Westley was placed in, and all hallways connecting these locations from the dates described in the Complaint – from January 13, 2020 through January 18, 2020, March 18, 2020, May 29, 2020, and December 26, 2020.  (ECF Doc. 48-8, p. 8.)  All GTL recordings from May 29, 2020.  (ECF Doc. 48-8, p. 9.)

2.     **Defendants' Response**

Security video footage from January 18, 2020, was provided as Defendants Response to Discovery Bates Stamped 000001.  Security video footage from December 26, 2020, was provided as Defendants Response to Discovery Bates Stamped 000002.  No video footage was created or retained per ODRC policy for alleged events on March 18, 2020, May 29, 2020.  The remainder of the request is denied.  The requested video footage was either not retained or created.  (ECF

Doc. 48-8, p. 9.) GTL recordings are not ODRC records and must be obtained from GTL. (*Id.*)

Thus, Defendants produced one of the requested videos relating to Claim 3—video footage from "January 18, 2020, at or around 10:00 PM – 11:00 PM"—and one of the requested videos relating to Claim 7—video footage from "December 26, 2020, in Block 14 West Dayroom by the TV and showers." (ECF Doc. 48-5, pp. 5, 7, ECF Doc. 48-8, pp. 8-9.) As it relates to the other requested videos, Defendants informed Plaintiff that all other requested video footage was either not retained or created. (ECF Doc. 48-5, pp. 5-7, ECF Doc. 48-8, pp. 8-9.)

With respect to the requested GTL recording, Defendants informed Plaintiff that the recordings are not ODRC records, and that the requested recording would therefore have to be obtained from GTL. (ECF Doc. 48-5, p. 6, ECF Doc. 48-8, p. 9.) During the Court's August 6, 2025 telephonic status conference, Defendants' counsel noted that he did not believe Plaintiff had issued a subpoena to GTL for the recording and stated that Defendants would issue the subpoena for the recording and share it with Plaintiff once received. (ECF Doc. 54, p. 18.)

### III.    Law & Analysis

#### A.    Parties' Arguments

Plaintiff asserts that Defendants are responsible for the spoliation of material surveillance evidence relating to all four remaining claims, Claims 3, 5, 6, and 7,[3] and asks the Court to issue an adverse inference instruction to the jury stating that the missing footage would have supported Plaintiff's claims and/or to take judicial notice of Defendants' alleged bad faith actions over the past several years of litigation. (ECF Doc. 48; ECF Doc. 50.) In addition to requesting an adverse inference jury instruction, Mr. Westley asks the Court to impose additional sanctions

---

[3] He says he learned evidence was destroyed or made unavailable on January 9, 2023, and that it became clear by June 5, 2025, that Defendants had caused spoliation of evidence as to Claims 3, 5, 6 and 7. (ECF Doc. 48, pp. 1-2.)

such as monetary penalties, striking of defenses, entering default judgment, and compelling full compliance with remaining discovery.  (ECF Doc. 48, pp. 4-5.)

Specifically, Plaintiff asserts that the incidents that are the subject of the four claims were each "captured by institutional video footage maintained by the ODRC" and the relevant "video footage constitutes direct, irrefutable evidence of the acts described."  (*Id*. at p. 3.)  He further asserts that he made "timely informal requests to the defendants to preserve said video footage prior to the expiration of ODRC's internal video retention policy," but that "Defendants failed to retain and preserve the video footage" despite his "requests for video preservation," and therefore willfully deprived him of "direct evidence of the assaults for each claim."  (*Id*.; *see also* ECF Doc. 50, pp. 1-5.)  He also argues that a GTL phone recording relating to Claim 6 has not been produced.  (ECF Doc. 48, p. 3; ECF Doc. 50, p. 4.)

Defendants assert in response that Mr. Westley has failed to identify specific records to support his argument that he timely requested the preservation of video footage.  (ECF Doc. 49, p. 3.)  Further, to the extent he is relying on informal grievances where he mentioned or asked staff to review video footage, Defendants note that Mr. Westley did not specifically ask TCI to preserve the surveillance camera footage, and further argue that the mere filing of a grievance is insufficient to alert Defendant to the need to preserve the evidence.  (*Id.* at pp. 4-5.)  They explain that they were able to produce some of the requested video footage because it was retained pursuant to ODRC retention policy 09-INV-01, but that the other requested footage was overwritten after fourteen days pursuant to the same policy.  (*Id.*)  Finally, they argue Plaintiff cannot prove spoliation of evidence because Defendants did not have a duty to preserve the evidence and that Plaintiff cannot prove the records were destroyed "with a culpable state of

mind." (*Id.* at pp. 5-6.)  As to the GTL recording, Defendants note that Plaintiff was already informed that he needed to request the relevant recording directly from GTL.  (*Id.* at p. 3.)

In his pro se reply brief, Mr. Westly identifies specific grievances, kites, and internal complaints (hereinafter "grievances") he allegedly submitted to authorities within the relevant retention periods, which he argues established a duty for Defendants to preserve the video evidence in anticipation of possible litigation.  (ECF Doc. 50, pp. 2-4 (citing ECF Doc. 1-4, pp. 40, 79-81, 83-84, 86).)  In response to Defendants' assertion that some of the videos were destroyed pursuant to governing retention policies, Mr. Westley argues that "internal policy cannot override federal discovery obligations."  (*Id.* at p. 5.)  Based on the evidence, he asserts that sanctions are warranted under Fed. R. Civ. P. 37(e), and requests an adverse inference under Rule 37(e)(2) and other sanctions "as appropriate to cure the prejudice."  (*Id.* at pp. 7-8.)

## B.    Legal Framework for Sanctions Based on Spoliation of ESI Evidence

"If 'a party destroys evidence in anticipation of litigation, the trial court may impose sanctions for spoliation.'"  *Courser v. Michigan House of Representatives*, 831 F. App'x 161, 187 (6th Cir. 2020) (quoting *Applebaum v. Target Corp.*, 831 F.3d 740, 744 (6th Cir. 2016)).  The Sixth Circuit has instructed district courts to address spoliation questions "on a case-by-case basis, considering the purposes of a spoliation sanction and the factors for determining whether one should be imposed."  *Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012).

The Federal Rules of Civil Procedure govern the imposition of sanctions for failure to preserve electronically stored information ("ESI"),[4] providing as follows:

---

[4] While there is no direct evidence that the relevant video footage was electronically stored, the ODRC policy submitted by Defendants anticipates the use of "video management system software" to manage the surveillance videos and contemplates the preservation of video images on "computing devices" such as "a server, desktop computer, portable computing device or portable computing media[.]" (ECF Doc. 49-2, pp. 3, 5.)  Both parties' briefs also contemplate the application of Rule 37(e).  (ECF Doc. 49, pp. 2-3; ECF Doc. 50, pp. 7-8.)  Thus, the record indicates—and there is no dispute—that the video evidence in question is ESI subject to the requirements of

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  When Rule 37(e) applies, district courts may not rely on their inherent authority to determine when certain sanctions may be imposed.  *See* Fed. R. Civ. P. 37, 2015 Advisory Comm. Note; *Bistrian v. Levi*, 448 F. Supp. 3d 454, 464 (E.D. Pa. 2020) (citing same). For example, an adverse inference instruction may only be imposed as a sanction for spoliation of electronic information when the requirements of Rule 37(e)(2) have been met.  *See Applebaum*, 831 F.3d at 745 (citing Fed. R. Civ. P. 37, 2015 Advisory Comm. Note).

Before imposing spoliation sanctions under Rule 37(e)(1), district courts must consider: whether the non-moving party had a duty to preserve the evidence at the time of the loss; and if so, whether the party took reasonable steps to preserve the evidence; whether the evidence can be restored or replaced through additional discovery; and whether the moving party suffered prejudice resulting from the loss of the evidence.  *See* Fed. R. Civ. P. 37, 2015 Advisory Comm. Note; *Bistrian*, 448 F. Supp. 3d at 465 (citing same); *Hargis v. Overton Cnty., Tennessee*, No. 2:22-CV-00011, 2023 WL 8604139, at *7-13 (M.D. Tenn. Dec. 12, 2023).  Further, before

---

Rule 37(e).  *See, e.g., Bruin v. Swank*, No. 5:16-CV-105-BJB, 2025 WL 289679, at *7-8 (W.D. Ky. Jan. 24, 2025) (applying Rule 37(e) when "all the record evidence indicates that the video was electronically stored information").

imposing the more substantial sanctions available under Rule 37(e)(2)—like adverse inferences, dismissal, or default judgment—courts must also consider whether the party "acted with intent to deprive another party of the information's use in litigation."[5] Fed. R. Civ. P. 37(e)(2).

In assessing whether, and when, a party has a duty to preserve evidence as contemplated in Rule 37(e), courts apply the existing common-law "duty to preserve relevant information when litigation is reasonably foreseeable." Fed. R. Civ. P. 37, 2015 Advisory Comm. Note; *see Hargis*, 2023 WL 8604139, at *7 (citing same). In the Sixth Circuit, "a party to civil litigation has a duty to preserve relevant information, including ESI, when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). In addition, courts may sometimes consider "whether there is an independent requirement that the lost information be preserved," like a requirement arising from "statutes, administrative regulations, an order in another case, or a party's own information-retention protocols." Fed. R. Civ. P. 37, 2015 Advisory Comm. Note.

When assessing whether a party has suffered prejudice under Rule 37(e)(1), the court's evaluation "necessarily includes an evaluation of the [lost] information's importance in the litigation." Fed. R. Civ. P. 37, 2015 Advisory Comm. Note; *see Hargis*, 2023 WL 8604139, at *7 (citing same). The rule does not place the burden of proving or disproving prejudice on a particular party, giving judges discretion to determine how to assess prejudice in each case. *Id.*

---

[5] A finding of intent is not necessary to award lesser sanctions as contemplated in Rule 37(e)(1), which requires only a showing of prejudice resulting from the loss of the relevant evidence. Fed. R. Civ. P. 37(e)(1). Conversely, if a court finds the intent necessary to support the stronger sanctions available under Rule 37(e)(2), it need not "find prejudice to the party deprived of the information." Fed. R. Civ. P. 37, 2015 Advisory Comm. Note.

**C.**     **Plaintiff's Motion for Sanctions**

Plaintiff seeks spoliation sanctions based on Defendants' alleged failure to produce all or part of the video recordings he requested in discovery to support his four remaining claims. Specifically, he asserts that Defendants had a duty to preserve the requested video footage at the time the footage was destroyed because he filed "numerous grievances, kites, and formal complaints . . . within the retention period and [they were] addressed by the Warden."  (ECF Doc. 50, pp. 2-4 (citing ECF Doc. 1-4, pp. 40, 79-81, 83-84, 86).)  Under the retention guidelines provided by Defendants, ODRC was required to take the following actions with respect to "[a]ll video images reviewed as part of an official DRC investigation or . . . administrative process": (1) reference the images in the investigative or administrative report; (2) copy, save, store, and retain the images in the investigative or administrative record; and (3) maintain and retain the records pursuant to applicable retention schedules.  (ECF Doc. 49-2, pp. 5-6.)  ODRC was also required to retain all images that were "part of any matter being litigated or a 'litigation hold letter' is issued" until released by legal services.  (*Id.* at p. 6.)  In contrast, the policy provided that video images not subject to specific retention requirements must be "retained a minimum of 14 calendar days."  (*Id.*)  Plaintiff maintains that his grievances provided Defendants sufficient notice to create a duty for Defendants to retain the videos relevant to each of the four claims within the 14-day retention period established by ODRC's policies.  (ECF Doc. 50, pp. 2-4.)

Because this Court must address spoliation questions "on a case-by-case basis, considering the purposes of a spoliation sanction and the factors for determining whether one should be imposed," *Adkins*, 692 F.3d at 506, the Court will consider each claim in turn.

11

1.    **Claim 7**

With respect to Claim 7—which challenges the alleged use of a chemical agent by Defendant Eubank—Plaintiff identifies a grievance dated January 8, 2021, as evidence that he requested the preservation of video evidence relevant to the December 26, 2020 incident within less than 14 days.  (ECF Doc. 50, p. 4 (citing ECF Doc. 1-4, p. 86).)  Mr. Westley asserted in his grievance that Defendant Eubank had maliciously and sadistically used a chemical agent against him with no just cause at "around 2:43 in 14 West," and asked institutional authorities to "please review and save the video footage from this incident."  (ECF Doc. 1-4, p. 86.)[6]

In his 2022 discovery requests, Mr. Westley asked Defendants to produce (1) camera footage from the December 26, 2020 incident in Block 14 West Dayroom by the TV and showers and (2) later footage where Defendant Eubank allegedly stood in front of Plaintiff's cell door and taunted him about the assault.  (ECF Doc. 49-1, p. 4.)  While Defendants did retain and produce footage of the alleged use of chemical agent by Defendant Eubank on "December 26, 2020, in Block 14 West Dayroom by the TV and showers" (ECF Doc. 48-5, p. 7),  they did not produce the requested camera footage of defendant Eubank standing in front of Plaintiff's cell door taunting him (ECF Doc. 49-1, p. 4), indicating that the requested video was either not retained or not created (ECF Doc. 48-5, p. 7).  Since Defendants did produce the video capturing Defendant Eubank's use of a chemical agent in Block 14 West Dayroom on December 26, 2020, Plaintiff's request for sanctions can only proceed in connection with Defendants' alleged failure to produce additional video footage from later that day in front of Plaintiff's cell door.

The first question in this Rule 37(e) analysis is whether Defendants "should have known" within the 14-day retention period following the December 26, 2020 incident that video footage

---

[6] A response from Donna Crawford dated February 4, 2021, also advised Plaintiff that the Warden and Deputy Warden Beebe had reviewed a video of the incident.  (ECF Doc. 1-4, p. 86.)

of Defendant Eubank standing in front of Plaintiff's cell door at some point on the same day "may be relevant to future litigation.'" *John B.*, 531 F.3d at 459; *see Bistrian*, 448 F. Supp. 3d at 467; *Hargis*, 2023 WL 8604139, at *7.  The Court finds nothing in Plaintiff's January 8, 2021 request for authorities to review and save "the video footage *from this incident*" that would have reasonably put Defendants on notice of a duty to preserve surveillance video for a different location and time.  (ECF Doc. 1-4, p. 86 (emphasis added).)  The Court further observes that there was also no "independent requirement that the lost information be preserved," since the ODRC information retention protocols required the preservation of the video recording for only 14 days.  Fed. R. Civ. P. 37, 2015 Advisory Comm. Note; (*see* ECF Doc. 49-2, pp. 5-6).

The Court therefore finds that Mr. Westley has not met his burden to show that Defendants had a duty to preserve video evidence from the hall outside his cell on December 26, 2020, and certainly has failed to show that such a duty was in place before January 9, 2021, when the policy permitted the video to be overwritten.  Accordingly, Plaintiff has failed to show that Defendants caused the spoliation of video surveillance evidence in connection with Claim 7.

### 2.      Claim 3

With respect to Claim 3—which challenges Defendants' role in the alleged attack on Plaintiff by inmate Hart—Plaintiff identifies a grievance dated January 29, 2020, as evidence that he requested preservation of the video evidence relevant to the January 18, 2020 incident within less than 14 days.  (ECF Doc. 50, p. 2 (citing ECF Doc. 1-4, p. 40).)  In his grievance, Plaintiff alleged that defendants conspired to have him assaulted by inmate Hart and forced him to go into the cell with Hart, and that Defendant Grimm sprayed Hart after the assault and told him "you can't keep crashing on your cellys."  (ECF Doc. 1-4, p. 40.)  Plaintiff did not mention

any video evidence in his grievance, and none of the responses from authorities mentioned video evidence being collected, viewed, or considered.  (*Id.*)

In his 2022 discovery requests, Mr. Westley asked Defendants to produce camera footage from: (1) the "whole day" of January 17, 2020, including where Plaintiff was taken out of the isolation cell and forced to move in the cell with inmate Hart; (2) January 18, 2020, around 10-11 p.m., when Plaintiff was in segregation in the cell with inmate Hart; (3) outside segregation as Plaintiff was transported to Medical; and (4) inside Medical in the Infirmary hallway, Cell 134. (ECF Doc. 49-1, p. 3.)  Defendants did retain and produce footage from January 18, 2020, at or around 10-11 p.m., the time of the alleged assault by inmate Hart.  (ECF Doc. 48-5, p. 5, ECF Doc. 49, p. 4.)  But they did not produce the requested camera footage for the "whole day" of January 17, 2020, or the requested footage of Plaintiff being transported to Medical or inside the Infirmary hallway, indicating instead that such videos were either not retained or not created. (*See* ECF Doc. 48-5, p. 5.)  Since Defendants did produce video capturing Plaintiff's alleged assault by inmate Hart, Plaintiff's request for sanctions can only proceed in connection with Plaintiff's requests for additional video evidence from January 17 and 18, 2020.

The first question, again, is whether Defendants "should have known" within the 14 day retention period following the January 18, 2020 incident that footage for the "whole day" of January 17, 2020, and additional footage—for unspecified times, but presumably on January 18—outside the segregation cell and inside the infirmary "may be relevant to future litigation." *John B.*, 531 F.3d at 459; *see Bistrian*, 448 F. Supp. 3d at 467; *Hargis*, 2023 WL 8604139, at *7. The Court finds nothing in Plaintiff's January 29, 2020 grievance—which did not mention surveillance videos, activities on January 17, or activities outside the segregation cell or inside the infirmary—that would have reasonably put Defendants on notice of a duty to preserve

14

additional surveillance video footage from January 17 or 18, 2020.  Further, there has been no showing that the ODRC information retention protocols required retention of any of the missing videos beyond the 14-day retention window that expired on January 31 and February 1, 2020.

The Court therefore finds that Mr. Westley has not met his burden to show that Defendants had a duty to preserve additional video evidence from January 17 or 18, 2020, and certainly has not shown that such a duty applied before the expiration of the retention period on January 31 and February 1, 2020.  Accordingly, Plaintiff has failed to show that Defendants caused the spoliation of video surveillance evidence in connection with Claim 3.

### 3.      Claims 5 and 6

With respect to Claim 5—which alleges that Defendant Garvey coughed on Plaintiff in an attempt to infect him with COVID-19—Plaintiff identifies grievances he filed on March 18, March 27, and April 9, 2020, as evidence that he requested preservation of the video evidence for the March 18, 2020 incident within less than 14 days.  (ECF Doc. 50, pp. 2-3 (citing ECF Doc. 1-4, pp. 79-81).)  On March 18, Mr. Westley reported that Garvey coughed on him at 10:19 a.m. and told him she had the coronavirus and hoped he got it; he reported that "there were other inmates who witness this *along with being captured on video footage*."  (*Id.* at p. 79 (emphasis added).)  He called the actions "malicious and sadistic especially because we are all going through a crisis," and said he was notifying his family and the director.  (*Id.*)  On March 27, Mr. Westley filed another report, asserting: "If you all try to sweep her misconduct under the rug I'm going to have my family get in contact with the Governor's office because her actions were terroristic."  (*Id.* at p. 80.)  On April 9, a week after the expiration of the retention period, Plaintiff reiterated that the incident was around 10:20 a.m. on March 18, and noted: "Everyone in commissary witnessed her action including the commissary workers."  (*Id.* at p. 81.)

15

With respect to Claim 6—which alleges that Defendant Prasky coughed on Plaintiff in an attempt to infect him with COVID-19—Plaintiff identifies grievances he filed on June 1 and June 8, 2020, as evidence that he requested preservation of the video evidence for the May 29, 2020 incident within less than 14 days.  (ECF Doc. 50, pp. 3-4 (citing ECF Doc. 1-4, pp. 83, 84).)  On June 1, Mr. Westley complained that Prasky had "maliciously and sadisticly [sic] coughed on [him.]"  (ECF Doc. 1-4, p. 83.)  He told the Warden that they needed to talk "ASAP," and explained: "I don['‍]t have COVID 19 because I stay to myself and stay clean.  For now the issue is in house but I do have irrefutable evidence."  (*Id.*)  On June 8, he was advised that he could file an informal complaint if he was not on suspension.  (*Id.*)  That same day, he filed a new grievance, saying the Warden had access to "*the video footage* and the audio from [Plaintiff's] phone conversation."  (*Id.* at p. 84 (emphasis added).)  Plaintiff explained that Prasky coughed on him at the CO desk on May 29, 2020, around 6:35 p.m., and told Plaintiff "that mask you are wearing doesn't work"; Plaintiff reportedly pointed at the camera and told Prasky "I'm writing you up for that because what you did is a crime."  (*Id.*)  Plaintiff also reported that Prasky came to his door at 9:30 and apologized, which was recorded on Plaintiff's GTL tablet because he was on the telephone at the time.  (*Id.*)  Plaintiff asserted that the Warden should review the described "irrefutable evidence" of "the malicious, racial indifference."  (*Id.*)  The next day, Plaintiff was instructed to address the issue with his unit manager.  (*Id.*)

Mr. Westley notes that he was on a grievance restriction at the time of the March, April, and June 2020 submissions, explaining that is why he submitted multiple "kites" rather than a formal grievance.  (ECF Doc. 50, p. 2 (citing ECF Doc. 1-4, p. 35).)  The grievance restriction was imposed under Administrative Rule 5120-9-31, which permits inmates to "be issued restricted access to the inmate grievance procedure based upon an inmate's abuse or misuse of

16

the procedure," and was in place from March 16 to June 16, 2020.  (ECF Doc. 1-4, p. 35.)  The restriction was imposed based on findings that Plaintiff: had filed nine complaints since January 2020; had inundated the system with redundant complaints; had repeatedly filed the same informal complaints, without allowing staff time to resolve his concerns; and/or did not attempt to resolve his complaints at the lowest level, using the kite system.  (*Id.*)  Under the restriction, Plaintiff retained access to the kite system and was permitted to continue to "pursue issues which could present a substantial risk of physical injury" through the grievance procedure, but was required to take up any "emergency" issues via kite; the institutional inspector had authority to determine when access to the grievance procedure was permitted for "emergency" issues.  (*Id.*)

In his 2022 discovery requests for Count 5, Mr. Westley requested camera footage of: (1) March 18, 2020, at the cashier's window in the Commissary at or around 10-11 a.m.; (2) Mr. Westley leaving the Commissary to report the incident in the eating area; and (3) "on the yard" where Mr. Westley again reported the incident.  (ECF Doc. 49-1, p. 3.)  In his 2022 discovery requests for Count 6, he requested: (1) camera footage of the incident that occurred on May 29, 2020 in Block 14 West at the Correction Officer's desk at or around 6:00 PM – 7:00 PM; (2) camera footage of Block 14 West in front of cell 174; and (3) Plaintiff's GTL recorded phone conversation on May 29, 2020 around 9:30 AM.  (*Id.*)  In response, Defendants stated that the requested video footage was either not retained or not created, and that "GTL phone recordings are not ODRC records and must be obtained from GTL."  (ECF Doc. 48-5, p. 6, ECF Doc. 48-8, p. 9.)  Defense counsel reiterated in a telephone conference with the Court that Defendants do not have GTL recordings in their possession, but agreed to issue a subpoena requesting the recording from GTL, and to provide a copy of that recording to Plaintiff upon receipt.  (ECF Doc. 54, p. 18.)  Defendants have since provided the GTL recording to Plaintiff.  (ECF Doc 79;

17

ECF Doc. 80.)  Plaintiff's request for sanctions relating to Counts 5 and 6 will therefore be considered as to the requested video footage, but not as to any GTL audio recordings.

As to Claim 5, the Court must begin by considering whether Defendants "should have known" within the 14-day retention period—i.e., by April 1, 2020—that the requested video footage for the Commissary, the eating area, and/or the yard "may be relevant to future litigation." *John B.*, 531 F.3d at 459; *see Bistrian*, 448 F. Supp. 3d at 467; *Hargis*, 2023 WL 8604139, at *7.  Considering the grievances submitted on or before April 1, 2020, Plaintiff notified authorities of the date and time of the incident and said it was captured on video; but he did not specify the location until a week after the retention period expired.  (ECF Doc. 1-4, pp. 79-81.)  The Court finds nothing in the March 2020 grievances that would have reasonably put Defendants on notice of any duty to preserve surveillance videos of Mr. Westley reporting the incident in the eating area or on the yard, but concludes that further consideration is warranted as to whether Defendants should have known by April 1, 2020, that surveillance video footage from 10:19 a.m. on March 18, 2020, might be relevant to future litigation.

As to Claim 6, the Court must consider whether Defendants should have known within the 14-day retention period—i.e., by June 12, 2020—that the requested video footage for the CO's desk from 6:00 – 7:00 p.m. and later footage in front of cell 174 may be relevant to future litigation.  Considering Plaintiff's written grievances, Plaintiff notified authorities of an incident at CO's desk around 6:35 p.m. on May 29, 2020, and a further conversation in front of Plaintiff's door at the "9:30 count," and specified that authorities had access to video footage that provided "irrefutable evidence" of his complaints.  (ECF Doc. 1-4, pp. 83-84.)  The Court concludes that further consideration is therefore warranted as to whether Defendants should have known by

June 12, 2020, that surveillance video footage on May 29, 2020, from 6:00 – 7:00 p.m. at the CO's desk and at 9:30 by Plaintiff's door, might be relevant to future litigation.

Defendants cite to one unpublished district court decision in support of their argument that Plaintiff "merely filing a grievance 'would not have alerted anyone to preserve evidence from a hallway security camera.'"  (ECF Doc. 49, p. 5 (quoting *Briggs v. Plichta*, No. 1:13-CV-1280, 2017 WL 4051694, at *3 (W.D. Mich. Aug. 11, 2017), *report and recommendation adopted*, No. 1:13-CV-1280, 2017 WL 3981096 (W.D. Mich. Sept. 11, 2017)).)  But the *Briggs* court did not broadly hold that inmate grievances cannot create a duty to preserve surveillance video camera footage.  Instead, the *Briggs* court addressed a grievance asking for "a video allegedly 'video taped by the staff'"—apparently a hand-held camera recording—to "be 'kept for prosecution,'" concluding that such a request "would not have alerted anyone to preserve evidence from a *hallway* security camera."  *Briggs*, 2017 WL 4051694, at *3 (emphasis added).

The *Briggs* court did go on to observe:

> [T]he Sixth Circuit has cautioned that federal courts should avoid interfering with the ability of prison administrators to manage their institutions. *See Adkins*, 692 F.3d at 506. Plaintiff has not cited and I am not aware of any case finding that a mere grievance suffices to create a duty to preserve video evidence. Prisoner grievances threatening litigation are very common.

*Id.* (emphasis added).  But other district courts have held that grievances submitted by prison inmates may be sufficient to create a duty to preserve surveillance video evidence in some circumstances.  *See, e.g., Bruin v. Swank*, No. 5:16-CV-105-BJB, 2025 WL 289679, at *6 (W.D. Ky. Jan. 24, 2025) ("In the prison context, courts have held that 'a duty to preserve may attach ... when an inmate files grievances about [an] incident.'") (quoting *Bistrian*, 448 F. Supp. 3d at 469); *Manning v. Erdos*, No. 1:22-CV-371, 2024 WL 2882647, at *4 (S.D. Ohio June 7, 2024) ("In some circumstances, courts have found that a prisoner's filing of grievances is sufficient notice that litigation may occur, and evidence should be preserved.") (citing cases).

19

For example, "[a] number of courts have found that government defendants reasonably should have anticipated litigation from the time an inmate was seriously injured or died in custody."  *Bistrian*, 448 F. Supp. 3d at 469, n. 45 (citing cases); *see Hargis*, 2023 WL 8604139, at *7 (quoting *Bistrian*).  Some courts refer to the following considerations in assessing "whether and when a duty to preserve evidence arises" following an inmate's injury or death in custody:

> the type and seriousness of the injury; how often similar kinds of incidents lead to litigation; the "course of conduct between the parties, including past litigation or threatened litigation"; and what steps both parties took after the incident and before the loss of the evidence, including whether the defendant initiated an investigation into the incident.

*Hargis*, 2023 WL 8604139, at *7-8 (quoting *Bistrian*, 448 F. Supp. 3d at 468); *see Manning*, 2024 WL 2882647, at *4 (same).  The Court finds the same considerations relevant to the analysis in this case.

As to the first consideration—the type and seriousness of the injury—although Plaintiff complained that he was coughed on and threatened with a COVID-19 infection in both incidents, he did not report any specific injuries that he suffered as a result.  (*See* ECF Doc. 4-1, pp. 79-81, 83-84.)  For example, he did not report medical treatment for a resulting COVID-19 infection, and certainly did not report a related hospitalization or other significant complications.  Indeed, Plaintiff reported in his June 1 grievance: "I don[']t have COVID 19 because I stay to myself and stay clean."  (*Id.* at p. 83.)  The type and seriousness of Mr. Westley's injury thus does not support a finding that his grievances created a duty for Defendants to preserve the video footage.  *Compare Hargis*, 2023 WL 8604139, at *8 (finding a duty to preserve video evidence when a person in custody "stopped breathing [and died] after being forcibly restrained by more than half-a-dozen . . . employees during an approximately twenty-minute struggle"); *Bistrian*, 448 F.

Supp. 3d at 470-71 (finding a duty to preserve video evidence when an inmate "was seriously injured and required immediate and substantial medical attention," among other considerations).

As to the second consideration—how often similar incidents have led to litigation—there is no statistical evidence before the Court, and the Court will not speculate as to how often similar incidents have led to litigation.

Turning to the third consideration—the course of conduct between the parties, including past and threatened litigation—the evidence reflects that Mr. Westley had a history of filing frequent administrative complaints, but did not file a lawsuit based on those complaints until August 27, 2021, several months after the relevant video retention periods expired.  (*See* ECF Doc. 1.)  Indeed, at the time of the grievances, administrators had placed Mr. Westley on a 90-day "grievance restriction" based on a finding that he had inundated the system with redundant complaints, repeatedly filed the same informal complaints without allowing staff time to resolve the concerns, and/or failed to attempt to resolve his complaints at the lowest level.  (ECF Doc. 1-4, p. 35.)  The restriction continued in place until after the expiration of the retention periods. (*Id.*)  Both the findings underlying the grievance restriction—i.e., that Plaintiff had a history of filing frequent, repetitive, redundant complaints—and the fact that the grievance restriction was in place at the time of the relevant incidents—requiring specific permission from an inspector on an "emergency" basis to access ordinary grievance procedures—suggest that Plaintiff was abusing the institution's administrative process with his complaints, which weighs against a finding that Defendants should have known the video footage relevant to these complaints in particular may be relevant to future litigation.  This assessment is bolstered by the fact that there were no pending lawsuits regarding his claims at the time the video footage was overwritten. Overall, the course of conduct between the parties does not support a finding that Defendants

"should have known" the surveillance videos relevant to the grievances at issue may be relevant to future litigation.  *Compare Bruin*, 2025 WL 289679, at *6 (finding a duty to preserve video evidence when an institution was actively adjudicating a grievance over the incident and its officers "were already in litigation with [the plaintiff] over related confrontations," with four amended complaints filed before the videos were destroyed).

As to the fourth consideration—what steps the parties took after the incidents and before the loss of the relevant evidence—the evidence shows that Plaintiff made authorities aware of the incidents and the fact that they were captured on surveillance video but did not specifically ask authorities to preserve the videos.  For Claim 5, Plaintiff reported that he notified his family and the director about the incident (ECF Doc. 1-4, p. 79) and threatened to contact the governor if authorities tried to "sweep [the] misconduct under the rug" (*id.* at p. 80), but did not request the preservation of the video evidence.  For Claim 6, a few months later, Plaintiff noted that he had not contracted COVID-19 because he "stay[ed] to [him]self and stay[ed] clean" and told authorities "[f]or now this issue is in house" (*id.* at p. 83); although he asked authorities to review the recordings (*id.* at p. 84), he did not request the preservation of the evidence.

For their part, authorities responded to the March grievances by reporting Plaintiff's complaints to Defendant Garvey's supervisor.  (*Id.* at pp. 79-81.)  As to the June grievances, authorities first advised Plaintiff that he could file an informal complaint if he was not "on suspension" and later instructed him to address the issue with his unit manager.  (*Id.* at pp. 83-84.)  They did not initiate a formal investigation, even though his grievance restrictions allowed continued access to grievance proceedings for "issues which could present a substantial risk of physical injury, such as a medical concern[.]"  (*See id.*; *id.* at p. 35); *compare Bistrian*, 448 F. Supp. 3d at 470 (observing that "a defendant's decision to open an investigation can indicate that

it was reasonable to expect a lawsuit").  Notably, the first grievance was filed on March 18, 2020, in the early days of COVID-19 restrictions, and the second just a few months later.  It is also notable that Defendants did not take any affirmative actions to destroy the relevant video recordings, which were instead overwritten pursuant to a governing retention policy.  In this context, where Plaintiff reported the two coughing incidents during the early days of COVID-19 restrictions while under a "grievance restriction" due to abuses of the administrative process and did not request preservation of the video evidence, and where the videos were then automatically overwritten pursuant to a governing retention policy, the Court concludes that the steps the parties took during the 14-day period between the incidents and the expiration of the retention periods do not support a finding that Defendants had a duty to preserve the video evidence.

For all of the reasons set forth above, the Court concludes that Plaintiff has failed to show that Defendants "should have known" within the applicable 14-day retention period—i.e., by April 1 or June 12, 2020—that the requested surveillance video footage relating to Claims 5 and 6 "may be relevant to future litigation."  *John B.*, 531 F.3d at 459; *see Bistrian*, 448 F. Supp. 3d at 467; *Hargis*, 2023 WL 8604139, at *7.  The Court therefore finds Mr. Westley has not met his burden to show that Defendants had a duty to preserve video evidence relating to the March 18 or May 29, 2020 incidents, and certainly has not shown that such a duty attached before the expiration of the relevant video retention periods on April 1 and June 12, 2020.  Accordingly, Plaintiff has failed to show that Defendants caused the spoliation of video surveillance evidence in connection with Claims 5 or 6.

Because Plaintiff has not met his initial burden to show that Defendants had a duty to preserve the unproduced video evidence relevant to Claims 3, 5, 6, or 7 at the time the evidence was automatically overwritten, this Court need not make further findings under Rule 37(e),

including whether Defendants took reasonable steps to preserve the evidence, whether the evidence can be restored or replaced through further discovery, whether Plaintiff suffered prejudice resulting from the loss of the evidence, and/or whether Defendants acted with intent to deprive Plaintiff of the information's use in litigation.[7]  *See* Fed. R. Civ. P. 37(e)(1)-(2).

### IV.    Conclusion

For all of the reasons set forth above, the Court finds that Plaintiff has not met his burden to show that Defendants caused the spoliation of evidence that Plaintiff requested in connection with the four claims pending before this Court.  Accordingly, Plaintiff's Motion for Sanctions and all relief requested therein (ECF Doc. 48) is **DENIED**.

December 5, 2025

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

---

[7] The Court observes that the evidence before this Court is clearly insufficient to support a finding of "intent" as required to award sanctions under Rule 37(e)(2).  Accordingly, even if this Court were to find spoliation proven under the terms of Rule 37(e)(1), neither an adverse inference nor default judgment would be available as a sanction.